UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| COMBINED ENERGIES,<br>A DIVISION OF THE UNION WATER-<br>POWER COMPANY, | ) ) ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | 1:07-cv-17-W |
| | ) | |
| CCI, INC., | ) | |
| | ) | |
| Defendant | ) | |

**RECOMMENDED DECISION ON
MOTIONS FOR SUMMARY JUDGMENT
AND ORDER ON MOTION FOR PERMISSION
TO FILE A SUR-REPLY**

The parties to this civil action were once "strategically aligned," by contract, to procure and perform certain Navy contract work in the northeast region of the United States.  The defendant, CCI, Inc., is a minority-owned corporation located in Alaska.  CCI enjoys preferential access to government contracts set aside for minority businesses because it qualifies under the federal 8(a) Small Disadvantaged Business program.  The plaintiff, Combined Energies, a division of The Union Water-Power Company, is a Maine-based energy conservation consulting and construction management business.  The parties' relationship grew out of the simple fact that CCI had the ability to obtain government contracts set aside for minority businesses and Combined Energies sought to have access to additional government contracts within its bailiwick.  As a primary contractor, CCI could obtain the work, despite being situated in Alaska.  As a primary subcontractor located in the northeast region, Combined Energies was in position

to perform or oversee the work.  The parties successfully bid, as a team, and were awarded a facilities management job order contract pertaining to Navy facilities in the northeastern United States.

This civil action arises from the fact that CCI persuaded the employees of Combined Energies to come work for it while the teaming relationship was ongoing and, thereafter, sought to discharge Combined Energies as the primary subcontractor based on a contention that Combined Energies was no longer able to perform its obligations.  Combined Energies has brought suit alleging a host of tort and contract claims.  CCI has filed a pair of summary judgment motions that, together, would dispose of all claims except for the breach of contract claim.  The first motion addresses CCI's claims of tortious interference, breach of the implied covenants of good faith and fair dealing, and defamation, as well as CCI's plea for punitive damages.  (Doc. No. 39.)  The second motion addresses CCI's breach of contract claim and its claim of unjust enrichment.  (Doc. No. 46.)

The Court referred both motions for report and recommendation pursuant to 28 U.S.C. § 636(b).  This Recommended Decision provides a proposed report of the summary judgment facts, drawn from the parties' competing Local Rule 56 statements of material facts.[1]  It also provides a legal discussion of whether those facts are sufficient to generate a trial-worthy issue on the challenged claims under Maine law.  It concludes with a recommendation that the Court grant both of CCI's motions, bearing in mind that even if the court were to adopt this

---

[1]        To describe the parties' Local Rule 56 statements of material fact and responses thereto as "competing" is somehow inadequate, perhaps "dueling" would be a better adjective.  It appears the parties are determined to draw the court into their sparring over the proper application of the Local Rules.  (See Docket No. 64.)  Rather than join that fray, I have simply applied the Local Rules to the statements of material fact and responses thereto and set forth my report as to each of the motion's undisputed material facts.  Both sides in this case are represented by competent counsel who know and understand Local Rule 56.  Yet counsel have filed a "general objection," argumentative qualifications, an unauthorized sur-reply, and various ad hominem attacks on each other, none of which is contemplated by Local Rule 56.  Having removed the wheat from the chaff, I am hopeful that the statements of fact set forth in this recommended decision accurately report the undisputed record that has been put before the court.

recommendation in its entirety, the breach of contract claim remains pending because CCI has only moved for partial summary judgment on the contract claim.

FACTS

Because CCI has filed two separate summary judgment motions, there are two separate sets of Local Rule 56 statements of material fact. I have kept these statements separate for purposes of making the following report of the summary judgment facts, primarily to assist the Court in its effort to review the record. The first motion and the related statements are addressed to CCI's contention that it did not engage in tortious conduct, which challenges counts I, IV, V[2] and VI. The second motion and the related statements are addressed to the claims of unjust enrichment and breach of contract, counts II and III.

***Facts drawn from the First Set of Statements (Doc. Nos. 40, 51, 57)***

In December 2004, Combined Energies and CCI entered into a Teaming Agreement to work together to submit a proposal to the US Navy in order to obtain a Job Order Contract (JOC). A JOC is an umbrella contract awarded by a federal agency to a contractor to perform construction projects on federal facilities. When the agency wants a project to be performed, the agency issues specific job orders to the prime contractor who holds the JOC. The Teaming Agreement between Combined Energies and CCI called for the parties to enter into a master subcontract agreement in the event that the Navy accepted the proposal and awarded a JOC to CCI as the primary contractor. (First Set of Local Rule 56 Statements ¶¶ 6-8, 12-13.[3]) Attendant to their teaming relationship, the parties also executed a Confidentiality and Nondisclosure Agreement in December 2004. That agreement provided that neither party would use the other

---

[2]     Combined Energies has voluntarily dismissed count V.

[3]     See Def.'s First Statement (Doc. No. 40); Pl.'s Opposing Statement (Doc. No. 51); Def.'s Reply Statement (Doc. No. 57).

3

party's confidential and proprietary business information "to compete with the disclosing party in any manner, or for any financial benefit or gain adverse to the disclosing party."  (Id. ¶ 52.)

Sometime in 2005, the Navy did award the JOC to CCI and, thereafter, the parties entered into a Strategic Alliance Agreement to outline the terms of their working relationship.  (Id. ¶ 16.) The Strategic Alliance Agreement provides:  "CE and CCI agree to strategically align themselves with one another in order to promote and utilize their respective expertise for the purpose of developing and performing projects utilizing the Contract (the 'Business')."  (Id. ¶ 17; Strategic Alliance Agreement § I(A), Doc. No. 52-3.)

Duncan Morrison was general manager of Combined Energies at the time the Teaming Agreement and Strategic Alliance Agreement were entered into.  (First Set of  Local Rule 56 Statements ¶ 9.)  Keith Burke is CCI's president.  (Id. ¶ 18.)  In 2006, Burke twice offered to buy Combined Energies.  Both times he was told that Energy East had no interest in selling the business.  (Id. ¶ 56.)  Burke wanted to acquire Combined Energies because there was not sufficient profit to be made under the strategic alliance due to the combined overhead of two companies.  (Id. ¶ 58.)

Through most of 2006, Burke also discussed with Morrison the possibility of Morrison coming to work for CCI.  (Id. ¶ 18.)  In November 2006, Morrison requested a meeting with Burke to discuss employment further and a meeting was held in early December 2006 in Florida. (Id. ¶¶ 19-20.)  Burke asked Morrison whether he thought any other Combined Energies employees would be interested in working for CCI.  Morrison stated that he thought they would be and he subsequently discussed with them the possibility of becoming CCI employees.  He indicated to them that there would be greater opportunity with CCI, that CCI was committed to creating an east coast operation, and that CCI wanted everyone at Combined Energies.  The other

4

professionals at Combined Energies all expressed a strong interest in working for CCI and CCI

sent each a formal offer of employment in December 2006.  In all, ten of eleven employees

accepted employment with CCI (the one exception being an office clerk who did not receive an

offer).  Thereafter, the employees tendered their resignation letters in January 2007.  (Id. ¶¶ 21-

25.)

In their resignation letters, the employees expressed the views that Energy East planned

to close Combined Energies down, that CCI offered more secure employment, that Combined

Energies would not be viable if CCI opened a separate operation on the east coast that performed

the same work, and that the Navy considered the cost of Combined Energies and CCI's combined

services to be too high.  (Id. ¶ 26.)

One former Combined Energies employee, Candida Hill, testified at her deposition that

she got the impression from Morrison that Combined Energies did not have corporate support to

expand its business.  Morrison also told employees that Combined Energies was up for sale.  In

fact, Combined Energies was marketed by its owners in 2003 or 2004.  (Id. ¶¶ 60-61.)  However,

according to the deposition testimony of Carl Taylor, Energy East subsequently decided that

there was a strategic reason to hold onto Combined Energies because it could provide energy

conservation "services within the footprint of the Energy East companies, in particular Central

Maine Power and the State of Maine."  (Id. ¶ 63;  Taylor Dep. at 80-81.)

During the time that she was employed by Combined Energies, and before giving notice

of her resignation, Candida Hill was also working to locate and obtain the office space and

equipment Combined Energies employees would use when they began working for CCI.  (Id. ¶¶

65-66.)

5

None of the Combined Energies employees had a written employment contract and there were no non-competition or non-solicitation agreements in place for any of them.  (Id. ¶ 28.)  As they initially planned, they would all leave Combined Energies and go to work for CCI at the same time.  (Id. ¶ 68.)  However, it was later arranged that they would not all leave simultaneously;  that some would leave immediately on January 2, 2007, and that others would give two weeks of notice on that date.  (Id. ¶¶ 69-70.)  This was an attempt to follow advice that they should leave Combined Energies with a sufficient workforce to fulfill existing obligations.  (Id. ¶ 71.)  CCI understood that this approach would present challenges for Combined Energies.  (Id. ¶ 77.)  CCI paid Morrison a $50,000 signing bonus in first quarter 2007.  (Id. ¶ 75.)

On January 17, 2007, after hiring away Combined Energies' staff, CCI sent Combined Energies a notice to cure, stating that Combined Energies was in default under the parties' agreements because Combined Energies was not able to supply skilled staff to complete the scope of work called for by the ongoing job orders.  (Id. ¶¶ 30, 72;  Notice to Cure, Doc. No. 51-20.)  The management of the Union Water-Power Company sought temporary employees on an emergency basis.  The Navy expressed reservations about the proposed replacement staff, but gave Combined Energies permission to proceed on a probationary basis.  For its part, CCI rejected the proposed replacement staff and terminated the relationship on January 25, 2007.  (First Set of Local Rule 56 Statements ¶¶ 32-33, 73-74.)

### *Motion for Permission to File Sur-Reply (Doc. No. 61)*

Combined Energies has requested permission to file a sur-reply in order to address characterizations that CCI made in its reply memorandum on the first motion for summary judgment.  Specifically, CCI stated that Combined Energies is being dishonest in its opposing statement when it states that Morrison told the other Combined Energies employees that

Combined Energies was in a "death spiral."[4]  (See Mot. for Permission at 2.)  The point of this motion appears to be that counsel for Combined Energies does not want to be regarded as a dissembler, but wants to explain all the reasons why CCI's counsel should be.  Additionally, CCI tacks on additional factual content that it omitted from its opposition statement, which is improper.  Plaintiff's Motion for Permission is DENIED.

### *Facts drawn from the Second Set of Statements (Doc. Nos. 47, 59, 66)*

The Teaming Agreement outlines "the nature and extent of the agreement between [CCI and Combined Energies] to develop and submit a proposal to the U.S. Navy, hereinafter referred to as "Government" for IDIQ JOC Facilities Support (hereinafter referred to as the "Program"). (Second Set of Local Rule 56 Statements ¶ 13;  Teaming Agreement, Doc. No. 52-2.)  The Teaming Agreement provides:  "This TEAMING AGREEMENT does not constitute, create, or give effect to a partnership, joint venture, or any other type of formal business entity. The rights and obligations of the parties hereto shall be limited to these expressly set forth herein."  (Second Set of Local Rule 56 Statements ¶ 14.)

The scope of the Teaming Agreement is reflected in several provisions.  First, and most fundamentally, the Teaming Agreement relates that CCI, as the Prime Contractor, will submit a proposal to the Navy.  Cooperation with respect to that specific proposal is the purpose of the agreement.  Should the proposal be accepted, Paragraph 1A states that Combined Energies, as the Subcontractor, shall be responsible for a "scope of work" that is "consistent with Exhibit A." Exhibit A provides:

---

[4]       I concluded that the record did not support a finding that Morrison told the other Combined Energies employees that Combined Energies was in a death spiral.  For reasons set out in the discussion that follows, it does not ultimately matter what Morrison said to his co-workers because the record does not support a finding that he was the employee or agent of CCI at the time.

> The scope of work for this agreement includes 8(a) related contract opportunities
> for the U.S. Navy facilities in ME, NH and VT and any additional future 8(a)
> contract and business development opportunities for the U.S. Navy facilities
> included in the CNRNE geographic territory (Commander Navy Region
> Northeast).

Having recognized that the scope of work may include work throughout the northeast, the

Teaming Agreement further provides in Paragraph 2 that the scope of the parties' obligations to

one another under the Teaming Agreement are "related only to the Subject Solicitation, and that

neither party is restrained in its ability to pursue any other program, contract or subcontract

unrelated to the Subject Solicitation. (Id. ¶¶ 15-16, 18.)

The Teaming Agreement also contains an integration clause that reads: "This TEAMING

AGREEMENT constitutes the entire, complete, and final understanding and agreement between

the parties concerning the Subject Solicitation and supersedes any previous understandings,

commitments, or agreements, oral or written." (Id. ¶ 17.)

The parties agreed that they would both use their "best efforts to cause a prime contract to

be awarded . . . as a consequence of the proposal" and to "enter into a master subcontract

agreement" should the prime contract be awarded. (Id. ¶¶ 19-20.)

The Teaming Agreement does not define "Subject Solicitation." CCI offers a statement

that the term refers to a particular request for proposal issued by the Navy that is identified as

solicitation number N62472-05-R-7510. Combined Energies denies this statement but does not

offer any alternative reference to supply meaning to the term. (Id. ¶ 21.) Combined Energies

does admit, however, that on April 22, 2005, CCI submitted a proposal to the Navy in response

to RFP N62472-05-R-7510. (Id. ¶ 22.) Combined Energies also admits that the Navy's

acceptance of this proposal, reflected in IDIQ JOIC No. N62472-05-R-7510, is the "prime

contract" referred to in the Teaming Agreement. (Id. ¶ 23.)

After the Navy awarded the prime contract to CCI, the parties entered into a Purchase Order Agreement (POA).  (Id. ¶ 24.)  The cover of the POA bears the words:  PROJECT, Work to be performed under Contract #N62472-05-R-7510.  (Id. ¶ 25.)  The POA sets forth the terms under which the parties would perform the work that they anticipated would be assigned to CCI by the Navy pursuant to IDIQ JOC No. N62472-05-R-7510.  (Id. ¶ 26.)

Concurrent with the execution of the POA, the parties also entered into the Strategic Alliance Agreement (SAA).  Both the POA and the SAA were negotiated and executed by Mr. Morrison and Mr. Hutton.  (Id. ¶¶ 27-28.)  The SAA provides that Combined Energies and CCI "teamed together to secure contract N62472-05-R-7510 ("the Contract").  The SAA specifically defines "the Contract" as Contract N62472-05-R-7510, and further provides that the parties would "strategically align themselves with one another in order to promote and utilize their respective expertise for the purpose of developing and performing projects utilizing the Contract ("the Business")."  (Id. ¶¶ 29-30.)  The SAA contains a provision that states:  "This Agreement shall be effective from the date hereof and shall continue through the term of the Contract and all approved option years."  (Id. ¶ 31.)

For their part, both Mr. Morrison and Mr. Hutton understood the term "Subject Solicitation" in the Teaming Agreement to refer to Solicitation No. N62472-05-R-7510.  (Id. ¶ 34.)  They both also agree that the "proposal" referenced in the Teaming Agreement is CCI's April 22 proposal to the Navy in response to RFP N62472-05-R-7510.  (Id. ¶ 35.)  Finally, they both contend that the "master subcontract agreement" referenced in the Teaming Agreement is the POA rather than the SAA.  (Id. ¶ 36.)  Combined Energies denies each of these assertions by Morrison and Hutton, asserting that their personal views are subject to credibility determinations by the finder of fact.

9

It is apparent from Combined Energies' opposition to summary judgment that Combined Energies contends that the SAA created an "expanded" contractual relationship between the parties that imposed reciprocal rights and obligations extending beyond the "Subject Solicitation" and the JOC awarded under RFP N62472-05-R-7510.  (Id. ¶¶ 36, 50.)  In addition, Combined Energies maintains that the December 28, 2004, Confidentiality and Nondisclosure Agreement also should have prevented CCI from hiring Combined Energies' employees.  (Id. ¶¶ 48-49.)  Combined Energies flags the language of the Confidentiality and Nondisclosure Agreement that provides "that the receiving party agrees that it will not use the INFORMATION it receives to compete with the disclosing party in any manner, or for any financial benefit or gain adverse to the disclosing party."  (Id. ¶ 49.)  As for the SAA, Combined Energies flags the fact that the SAA provides not just for work throughout the entire northeast, but also "other locations mutually agreed upon from time to time."  (Id. ¶ 52.)  In reply, CCI qualifies this statement about the SAA as follows:

> CE has failed to include the entire quotation, which states that the "primary geographic area for Business under this Agreement is the Northeastern United States to encompass, Massachusetts, Rhode Island, New Hampshire, Connecticut, Vermont, Maine, New York and New Jersey; and other locations mutually agreed upon from time to time by the parties as may make reasonable business sense for the Business."  (Taylor Declaration at Exhibit B, Art. I.D).  The "Business" is defined in an earlier subparagraph as "developing and performing projects utilizing the Contract."  (Id. at I.A.)  The "Contract," is defined even earlier in the agreement as "contract N62472-05-R-7510."  (Id. at ¶2)  Further, the Strategic Alliance Agreement states that "CE and CCI agree to strategically align themselves with one another in order to promote and utilize their respective expertise for the purpose of developing and performing projects ***utilizing the Contract***."  (Taylor Declaration at Exhibit B) (emphasis supplied).  Thus, all leads back to Contract N62472-05-R-7510.

(Id. ¶ 52.)

Combined Energies offers evidence that CCI pursued some jobs at the Portsmouth Naval Shipyard and elsewhere and that it performed at least one job at the Portsmouth Naval Shipyard without the participation of Combined Energies.  (Id. ¶¶ 56-58.)  However, there is no evidence to support a finding that these prospects or the jobs performed by CCI were related to contract N62472-05-R-7510.  Combined Energies also offers evidence that the CCI and Combined Energies "team," through the work of Morrison while he was at Combined Energies, sought or performed "market awareness" with respect to other potential projects apart from the Navy JOC. (Id. ¶ 59.)  Morrison, while employed by Combined Energies, also assisted Mr. Burke with efforts to pursue additional work unrelated to the Navy JOC and outside of the northeast that CCI would not necessarily have shared with Combined Energies.  (Id. ¶¶ 60-61, 70.)

When the employees left Combined Energies for CCI, they brought work with them that was not part of the Teaming Agreement.  (Id. ¶¶ 61, 63, 65, 69.)  In the Union Water-Power Company's business plan template for 2007, which was prepared in October 2006, Morrison characterized Combined Energies' outlook for 2007 as "promising" and opined that Combined Energies "is poised to have favorable earnings."  (Id. ¶ 68.)

### DISCUSSION

With its first summary judgment motion, CCI seeks an entry of judgment against counts I, IV, V, and VI, all of which are tort claims.  With its second motion, CCI requests that judgment enter against counts II and III, which assert claims of unjust enrichment and breach of contract.  Each motion is discussed in turn, below.

**A.    CCI's Motion for Summary Judgment on Counts I, IV, V, and VI**

In count I, Combined Energies alleges:  "By luring away CE's employees, CCI, through fraud and intimidation, tortiously interfered with CE's business relationships, with CE's

employees and with CE's ability to perform under its current contracts and to obtain new

contracts." (Compl. ¶ 24.)  Additionally, Combined Energies alleges that CCI interfered with its

existing contracts and prospective contracts through intimidation and fraud.  (Id. ¶ 30.)

In count IV, Combined Energies alleges that CCI failed to perform under the Strategic

Alliance Agreement and the Teaming Agreement in good faith, in breach of "implied covenants

that neither party shall by its unilateral action destroy or injure the right of the other party to

receive the fruits or benefits of those contracts or render performance impossible." (Id. ¶ 49.)

To support its breach of implied covenants claim, Combined Energies relies on the assertion that

CCI "raided" its workforce.  (Id. ¶ 52.)

In count V, Combined Energies alleges defamation.  Combined Energies voluntarily

dismissed this count on October 10, 2008.  (Doc. No. 53.)

In count VI, Combined Energies requests an award of punitive damages, alleging that

CCI's tortious conduct "was committed with ill will toward CE, or was so outrageous that ill will

is implied." (Id. ¶ 64.)

CCI argues that none of these claims are viable under Maine law, because the record

cannot reasonably support a finding of fraud or intimidation and because there is no independent

claim for breach of an implied covenant of good faith and fair dealing.

### 1.  *Tortious interference*

The claim of tortious interference "requires the existence of a valid contract or

prospective economic advantage, interference with that contract or advantage through fraud or

intimidation, and damages proximately caused by the interference." Petit v. Key Bank of Me.,

688 A.2d 427, 430 (Me. 1996).  To demonstrate fraud, Combined Energies must additionally

establish that CCI made a false representation of material fact, with knowledge of its falsity or in

reckless disregard of whether it was true or false, in order that another would act, or not, in reliance on the representation.  In addition, Combined Energies must adduce evidence of justifiable reliance and damages arising therefrom.  <u>Grover v. Minette-Mills, Inc.</u>, 638 A.2d 712, 716 (Me. 1994).

CCI argues that there is no evidence that it ever lied to or intimidated Combined Energies employees in order to hire them away from Combined Energies.  (First Mot. for Summ. J. at 14, Doc. No. 39.)  CCI says there is no evidence that it even needed to persuade the employees to leave Combined Energies.  (<u>Id.</u> at 15.)  CCI also argues that there is no evidence it ever lied to or intimidated one of Combined Energies' customers or subcontractors to make them discontinue a business relationship with Combined Energies.  (<u>Id.</u> at 15-16.)  In opposition, Combined Energies says that CCI made false statements through Morrison, whom it used as an agent or employee to lure away Combined Energies' employees.  Combined Energies argues that Morrison "intimidated and deceived" the employees "into believing that CE was about to go out of business; that Energy East would not support CE's growth; and that Energy East was trying to sell CE."  (Pl.'s First Opposition Mem. at 15-16, Doc. No. 50.)  It contends that the signing bonus Morrison received was payment for successfully delivering CE's staff.  (<u>Id.</u> at 17.)  Finally, Combined Energies makes the following broad contention:  "Every day that CCI worked to undermine CE's continued existence, CCI committed an ongoing fraud since it was outwardly pledging to work with CE for their mutual benefit through their strategic alliance."  (<u>Id.</u> at 17.)

The nub of this dispute is whether Morrison's statements can fairly be attributed to CCI.  CCI argues that they cannot because Morrison was merely gauging the interest of the other employees and was not engaged in any hiring activity for CCI.  Combined Energies says they can, because Morrison was a "de facto employee" or agent of CCI as of December 2006.  The

13

standard for determining this dispute turns on whether the record reflects sufficient indicia of

control by CCI over Morrison's conduct, as outlined by Judge Carter in the following excerpt:

> The Law Court has held that in order to establish a claim against a corporate
> entity based on vicarious liability, a plaintiff must show that the actor was an
> employee, and the vital factor in determining that relationship is "'whether or not
> the employer has the power of control or superintendence over' the other person."
> See Legassie v. Bangor Publ'g Co., 1999 ME 180, 741 A.2d 442, 444 (citing
> Timberlake v. Frigon & Frigon, 438 A.2d 1294, 1296 (Me. 1982)).  Maine agency
> law similarly focuses on control: "Agency is the fiduciary relationship 'which
> results from the manifestation of consent by one person to another that the other
> shall act on his behalf and subject to his control, and consent by the other so to
> act.'"  Perry v. H.O. Perry & Son Co., 1998 ME 131, 711 A.2d 1303, 1305 (citing
> Desfosses v. Notis, 333 A.2d 83, 86 (Me. 1975)).

Forum Fin. Group v. President & Fellows of Harvard Coll., 173 F. Supp. 2d 72, 88 n.22 (D. Me.

2001).  Morrison was an officer of Combined Energies when he spoke with the other employees

about going to work for CCI.  Although the record reflects that discussions between Burke and

Morrison and Morrison's own desire to work for CCI provided Morrison with an incentive to get

the other employees to join CCI, the record does not contain any evidence that Burke or anyone

else at CCI had any control over Morrison or made any attempt to direct him or supervise him in

connection with his efforts to gauge the interest of the other employees in going to work for CCI.

Although Morrison received a generous signing bonus, that payment does not fairly support a

finding that Morrison was CCI's agent or employee prior to January 2007.  Based on the

presentation that has been made by Combined Energies, I conclude that the finder of fact would

have to engage in speculation in order to determine that the relationship between CCI and

Morrison was an employment or agency relationship in November or December of 2006.  For

that reason, the claim that CCI tortiously interfered with Combined Energies' relationship with

its employees would require an improper extension of vicarious liability against CCI for conduct

engaged in by Morrison alone.

The tortious interference claim has one additional dimension.  Combined Energies has argued that "[e]very day that CCI worked to undermine CE's continued existence, CCI committed an ongoing fraud since it was outwardly pledging to work with CE for their mutual benefit through their strategic alliance."  (Id. at 17.)  The problem with this thematic argument is that the relationship it addresses is the contractual relationship between CCI and Combined Energies, not some third-party relationship that CCI "interfered" with.  Thus, any claim Combined Energies may have about an "ongoing fraud" related to the strategic alliance is either a fraud claim or a breach of contract claim, not a tortious interference claim.

Summary judgment should enter against count I.

### 2.  *Implied covenants*

In count IV Combined Energies alleges that the "Strategic Alliance Agreement and the Teaming Agreement contained implied covenants that neither party shall by its unilateral action destroy or injure the right of the other party to receive the fruits or benefits of those contracts or render performance impossible."  (Compl. ¶ 49.)  Combined Energies contends that CCI breached this implied covenant when it "raided CE's workforce."  (Id. ¶ 51.)  CCI argues that this claim is bogus;  that there is no such claim under Maine law unless the claim arises out of an insurance contract or comes under certain provisions of the Uniform Commercial Code.  (Def.'s First Mot. at 10;  First Reply at 11, Doc. No. 56.)  CCI is correct in this assessment.

The Law Court has not imposed an implied covenant of good faith and fair dealing in all contractual matters.  It has only recognized such an obligation where it has been provided for by statute or amounts to a breach of a fiduciary relationship.  Camden Nat'l Bank v. Crest Constr., Inc., 2008 ME 113, ¶¶ 18-19, 952 A.2d 213, 218 (declining to impose such an obligation between a bank with respect to its mortgagor because the transaction was not governed by the

15

Uniform Commercial Code and did not involve a fiduciary or agency relationship);  Me. Farms Venison, Inc. v. Peerless Ins. Co., 2004 ME 80, ¶ 17, 853 A.2d 767, 770 (explaining that the duty to act in good faith and deal fairly is imposed on an insurer with respect to its insured because of the agency relationship);  Haines v. Great N. Paper, Inc., 2002 ME 157, ¶ 15, 808 A.2d 1246, 1250 ("We have declined to impose a duty of good faith and fair dealing except in circumstances governed by specific provisions of the Uniform Commercial Code.").

CE argues that the Law Court held otherwise in Top of the Track Associates v. Lewiston Raceways, Inc., 654 A.2d 1293 (1995).  That is not an accurate assessment of the case, however. In Top of the Track, the Law Court observed that the terms of a contract can include implied provisions or conditions that are necessary in order to effectuate the express terms of the contract.  Id. at 1295.  The Law Court did not approve of a new contract claim for breach of an implied covenant of good faith.  It merely recognized a fundamental aspect of contract law:  that unilateral action by one party that is inimical to the fulfillment of the contract or that necessarily frustrates performance amounts to a breach, regardless of whether the conduct is directly addressed in the express terms of the parties' agreement.  Id. at 1296.

Summary judgment should enter against count IV.

### 3.  Defamation

Combined Energies has voluntarily dismissed this claim (count V).

### 4.  Punitive damages

There is no legal basis in this case for an imposition of punitive damages because there is no valid tort claim to support such damages.  "No matter how egregious the breach, punitive damages are unavailable under Maine law for breach of contract[.]"  Drinkwater v. Patten Realty Corp., 563 A.2d 772, 776 (Me. 1989).  Summary judgment should enter against count VI.

**B.      CCI's Motion for Summary Judgment on Counts II and III**

With its second summary judgment motion, CCI asks the Court to rule that the contract between the parties is restricted in scope to "work pursued and performed by CE and CCI under one specific contract."  (Def.'s Second Mot. for Summary J. at 2, Doc. No. 46.)  It does not otherwise request that judgment enter against the breach of contract claim stated in count III.  It does, however, request that summary judgment enter against Combined Energies' claim for unjust enrichment, count II.

*1.  Contract scope*

CCI argues that the Teaming Agreement and the Strategic Alliance Agreement extend only so far as contract N62472-05-R-7510 extends and no farther.  (Id. at 8-12.)  Combined Energies responds that the motion is "premature and wasteful" in relation to the contract claim because CCI is not seeking a dispositive judgment on the claim.  (Pl.'s Second Opposition Mem. at 1.)  Combined Energies maintains that "factual issues abound" on the question of contract scope and that CCI's witnesses should be subjected to cross-examination at trial before this question is resolved.  (Id. at 4.)  If there are factual issues that favor Combined Energies' interpretation of the scope of the agreement, Combined Energies has failed to put them on the record.

*a.  The Teaming Agreement*

In support of its proposed construction, Combined Energies points to Exhibit A of the Teaming Agreement, which describes the scope of work for the agreement to include "8(a) related contract opportunities for the U.S. Navy facilities in ME, NH and VT and any additional future 8(a) contract and business development opportunities for the U.S. Navy facilities included in the CNRNE geographic territory (Commander Navy Region Northeast)."  This language

17

reflects that additional teamwork with respect to other 8(a) Navy contracts was mutually

contemplated by the parties.  However, the Teaming Agreement also provides that the parties

were bound only with respect to "the Subject Solicitation, and that neither party is restrained in

its ability to pursue any other program, contract or subcontract unrelated to the Subject

Solicitation."  Even if the Court should agree with Combined Energies that the undefined term

"Subject Solicitation" could refer to other 8(a) "prime contracts" successfully solicited by the

parties as a team, the record reflects that there was but one successful solicitation of 8(a) work

under the Teaming Agreement as of the date of CCI's alleged breach.  In the absence of any

successful solicitation of an 8(a) contract other than the N62472-05-R-7510 contract, the

Teaming Agreement is necessarily operative only with respect to that solitary 8(a) contract.

That, at least, is the meaning of the Teaming Agreement language.  Combined Energies fails to

present any evidence of any other reasonable construction or course of dealings.

### b.  The Strategic Alliance Agreement

The Strategic Alliance Agreement is clearly restricted in its terms to contract N62472-05-

R-7510.  Combined Energies fails to present any facts that would justify a more expansive scope.

### c.  The Confidentiality and Nondisclosure Agreement

The Confidentiality and Nondisclosure Agreement provided only that neither party would

use confidential and proprietary business information flagged as such by the disclosing party "to

compete with the disclosing party in any manner, or for any financial benefit or gain adverse to

the disclosing party."   Combined Energies fails to offer any explanation as to how its former

employees amounted to confidential and proprietary business information.  Nor does it present

any facts suggesting that it ever disclosed information about its staff that was designated as

confidential or proprietary in order to come within the Confidentiality and Nondisclosure

18

Agreement.  Combined Energies does not explain how this agreement otherwise affects the scope of the parties' overall contractual relationship.[5]

### d.  Another contracts consideration

Finally, although the existence (and, hence, the scope) of a contract generally presents a factual question, to be legally binding a contract "must be sufficiently definite to enable the court to . . . fix exactly the legal liability of the parties."  <u>Bates v. Anderson</u>, 614 A.2d 551, 552 (Me. 1992).  In my view, the problem with Combined Energies' theory about the breadth of the Teaming Agreement and the Strategic Alliance Agreement is that it is entirely uncertain how the Court could fix the liability of CCI with respect to any theoretical government contracts that were never bid on by the parties as a team.  Even if the facts could support a factual finding that there was an exchange of promises to team up for prospective government contracts other than contract N62472-05-R-7510, the parties had not bid on or entered into any additional government contracts as a team as of the date of CCI's alleged breach, and, therefore, there is no practical means of fixing CCI's liability except insofar as contract N62472-05-R-7510 is concerned.

### e.  Recommended disposition regarding scope of contracts

The existence and scope of the contract is a factual question, as Combined Energies argues.  Nevertheless, the language of the written agreements does not reasonably support a finding that CCI and Combined Energies agreed to be bound to one another with respect to any 8(a) contract work that was not actually awarded to them while their Teaming Agreement was in place.  Although the Court need not rule on the question of contract scope at this juncture,

---

[5]     The Confidentiality and Nondisclosure Agreement is not even mentioned in CE's complaint, unlike the Teaming Agreement and Strategic Alliance Agreement.

Combined Energies fails to present a sufficient factual presentation for an imposition of liability extending beyond the one contract that the parties successfully teamed up for.  In my view, the Court should grant CCI's request and restrict the scope of the breach of contract claim so that it corresponds with contract N62472-05-R-7510 and not any other 8(a) government contract work that the parties might have, but did not, successfully bid on as a team.[6]

### 2.  *Unjust enrichment*

The final claim to be addressed is the claim for unjust enrichment, count II.  In its complaint, Combined Energies alleges that CCI was unjustly enriched by its acquisition of Combined Energies' employees, who received training from Combined Energies and brought work and existing relationships over to CCI from Combined Energies.  (Compl. ¶¶ 34-36.)  CCI argues that there is no unjust enrichment claim as a matter of law because there is a contract between the parties in this case and unjust enrichment is inapplicable when a contract governs the parties' relationship.  (Def.'s Second Mot. at 13-14.)  CCI also argues that Combined Energies never conferred a benefit on CCI, making an unjust enrichment claim inappropriate.  (Id. at 14-15.)  Finally, CCI argues that its acquisition of Combined Energies' employees cannot be considered unjust, where those employees were not bound by non-competition or no-solicitation agreements and the contractual relationship between Combined Energies and CCI did not restrict

---

[6]        Previously, the Court denied CCI's motion to compel arbitration of the parties' dispute because an agreement to arbitrate exists only in the POA and not in either the Teaming Agreement or the SSA.  Combined Energies v. CCI, Inc., 484 F. Supp. 2d 186 (D. Me. 2007), aff'd, 514 F.3d 168 (1st Cir. 2008).  The basis for that order was that "[t]he Complaint does not claim any disputes between CCI and CE about the work CE performed under  the POA, about payment in accordance with that work, about change orders, delay, quality of workmanship, or the myriad of other commonplace controversies between general contractors and subcontractors."  Id. at 189.  Affirming this rationale on appeal, the Court of Appeals indicated that arbitration was not necessary because the arbitration language in the POA was not expansive enough to incorporate disputes arising out of the teaming or alliance "agreement writ large or to each of the 'Contract Documents' individually."  Combined Energies v. CCI, Inc., 514 F.3d at 174.  In other words, even contract disputes arising out of the Teaming Agreement or the SSA have properly evaded arbitration.  The fact that I am  recommending that judgment enter on all claims other than the breach of contract claim is not, therefore, in conflict with the Court's earlier determination that the scope of the case is larger than a run-of-the-mill dispute between a contractor and a subcontractor.

either party from hiring the other's employees.  (Id. at 15-16.)  Combined Energies responds that its claim for unjust enrichment is proper for all the matters that extend beyond the parties' contractual relationship, such as the employee and preexisting business matters.  (Pl.'s Second Mem. in Opposition at 10-11.)  Combined Energies argues that the enrichment is unjust because CCI engaged in tortious conduct "in arranging a total desertion by causing these employees to breach their absolute duty of loyalty to their employer . . . before they ended their employment." (Id. at 13.)  I agree with CCI that Combined Energies is misapplying the equitable remedy of unjust enrichment.

To support a claim for unjust enrichment the plaintiff must demonstrate: (1) that it conferred a benefit on the defendant;  (2) that the defendant was aware of the benefit; and (3) that the retention of the benefit by the defendant, without fair payment, would be unjust or inequitable.  Bowden v. Grindle, 651 A.2d 347, 350 (Me. 1994).  Where the dispute over payment is governed by a contract between the parties, a claim for unjust enrichment will not lie. However, to the extent the dispute concerns matters that are not governed by a contract, or extra-contractual matters that extend beyond a contract between the parties, then the claim may afford a remedy.  Ingram v. Rencor Controls, Inc., 256 F. Supp. 2d 12, 22-23 (D. Me. 2003).

Combined Energies cannot sustain a claim for unjust enrichment on this record because the defection of Combined Energies' employees was not a benefit that Combined Energies conferred on CCI.  When Combined Energies' former employees resigned from Combined Energies and took up new positions with CCI they were pursuing their own personal interest. They were not acting at the behest of Combined Energies.  Consequently, the benefit that CCI realized in recruiting these employees was not one conferred by or on behalf of Combined Energies.

21

**Conclusion**

Plaintiff's Motion for Permission to File a Sur-Reply (Doc. No. 61) is DENIED.  I

RECOMMEND that the Court GRANT Defendant CCI, Inc.'s Motion for Summary Judgment

on Counts I, IV, V and VI (Doc. No. 39) and its Motion for Summary Judgment on Counts II and

III (Doc. No. 46).  Should the Court accept this Recommended Decision the case will be reduced

to a single count for breach of contract (count III) and that claim will be limited in scope to the

parties' contractual relationship as it pertains to the fulfillment of contract N62472-05-R-7510

with the Navy.

NOTICE

A party may file objections to those specified portions of a magistrate
judge's report or proposed findings or recommended decisions entered pursuant to
28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought,
together with a supporting memorandum, and request for oral argument before the
district judge, if any is sought, within ten (10) days of being served with a copy
thereof.  A responsive memorandum and any request for oral argument before the
district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de
novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

December 24, 2008

22