UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| COMBINED ENERGIES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV-07-17-B-W |
| | ) | |
| CCI, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON THE RECOMMENDED DECISION**

Combined Energies (CE) and CCI, Inc. (CCI) were once contractually "strategically aligned" to obtain and perform jobs from the United States Navy in the northeastern part of the United States. After CCI hired away a majority of CE's most valuable employees and discharged CE as its prime subcontractor, their relationship soured and CE filed the inevitable lawsuit. Following a pair of motions from CCI, the Magistrate Judge recommended summary judgment be granted on all but one of CE's claims, leaving only a narrowly confined breach of contract count. The Court agrees with the Magistrate Judge only on Count Four, which alleges a breach of implied covenants of good faith and fair dealing. For the remainder, the Court concludes that CE has raised genuine issues of material fact on Count One, a claim of tortious interference with an advantageous business relationship, Count Two, a claim of unjust enrichment, Count Three, a more broadly construed breach of contract claim, and Count Six, a punitive damages count, each of which raises factual questions susceptible to resolution by a factfinder.

## I.   PROCEDURAL HISTORY

The United States Magistrate Judge filed with the Court on December 24, 2008 her Recommended Decision (Docket # 68) (*Rec. Dec.*) on Defendant's Motion for Summary Judgment on Counts I, IV, V, and VI (Docket # 39) and Defendant's Motion for Summary Judgment on Counts II and III (Docket # 46). The Plaintiff CE filed its objection on January 16, 2009 (Docket # 70) (*Pl.'s Obj.*), and the Defendant CCI filed its response on February 3, 2009 (Docket # 72) (*Def.'s Resp.*). Oral argument was held on May 28, 2009.

## II.   DISCUSSION

CE's Complaint asserts five claims against CCI: tortious interference (Count One); unjust enrichment (Count Two); breach of contract (Count Three); breach of implied covenants including the duty of good faith and fair dealing (Count Four); and, punitive damages (Count Six).[1] *Compl.* (Docket # 1). The Magistrate Judge recommends that the Court grant CCI's motions for summary judgment, leaving only a breach of contract claim limited as it pertains to the fulfillment of contract N62472-05-R-7510 with the Navy. *Rec. Dec.* at 22. CE objects to the Magistrate Judge's recommendation. *Pl.'s Obj.*[2]

### A.   Tortious Interference (Count One)

CE alleges that "[b]y luring away CE's employees, CCI, through fraud and intimidation, tortiously interfered with CE's business relationships with CE's employees and with CE's ability to perform under its current contracts and to obtain new contracts." *Compl.* ¶ 24.

Tortious interference requires "'(1) that a valid contract or prospective economic advantage existed; (2) that the defendant interfered with that contract or advantage through fraud

---

[1] By letter dated October 10, 2008, CE consented to the dismissal of Count Five–a defamation and slander *per se* count. *Notice/Correspondence* (Docket # 53); *Rec. Dec.* at 16.
[2] The Court has not reiterated the details of the case, which are fully set forth in the Magistrate Judge's Recommended Decision. *Rec. Dec.* at 3-11.

2

or intimidation; and (3) that such interference proximately caused damages.'" *Currie v. Indus. Sec., Inc.*, 2007 ME 12, ¶ 31, 915 A.2d 400, 408 (quoting *Rutland v. Mullen*, 2002 ME 98, ¶ 13, 798 A.2d 1104, 1110). Fraud occurs when a defendant

> (1) mak[es] a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of whether it is true or false (4) for the purpose of inducing another to act or refrain from acting in reliance on it, and (5) the other person justifiably relies on the representation as true and acts upon it to the damage of the plaintiff.

*Rutland*, 2002 ME 98, ¶ 14, 798 A.2d at 1111 (quoting *Petit v. Key Bank of Maine*, 688 A.2d 427, 430 (Me. 1996)). Intimidation

> 'is not restricted to frightening a person for coercive purposes,' but rather exists wherever a defendant has procured a breach of contract by 'making it clear' to the party with which the plaintiff had contracted that the only manner in which that party could avail itself of a particular benefit of working with defendant would be to breach its contract with plaintiff.

*Currie*, 2007 ME 12, ¶ 31, 915 A.2d at 408 (quoting *Pombriant v. Blue Cross/Blue Shield of Maine*, 562 A.2d 656, 659 (Me. 1989)).

Although CE alleges that CCI interfered with CE's customer contracts, the greater part of its efforts are focused on interference with CE's relationships with its employees. CE has failed to identify, and the court has not found, a case where a court has applied Maine law to uphold a claim of tortious interference by one corporation against another for recruitment of employees. Nevertheless, the viability of such a theory finds support in one of the earliest tortious interference cases reported in Maine.

In *Perkins v. Pendleton*, 90 Me. 166, 38 A. 96 (1897), a stonecutter brought suit against a union, alleging that the union had pressured his employer to discharge him after the stonecutter refused to join its ranks. The Maine Law Court addressed whether liability could adhere for interference with the employment relationship of an at-will employee, concluding that the lack of

an employment contract for a definite term did not foreclose an interference claim. *Id.* at 176-77, 38 A. at 99-100. The *Perkins* Court relied in part upon *Walker v. Cronin*, 107 Mass. 555 (1871), where the Massachusetts Supreme Court held that an action could be maintained by a boot and shoe manufacturer against a third party for interfering with the manufacturer's existing and prospective relationship with its current and anticipated employees. *Perkins*, 90 Me. at 172-74, 38 A. at 98.

Although tortious interference more typically is invoked by a wronged employee, *see, e.g.*, *Currie*, 2007 ME 12, ¶¶ 30-35, 915 A.2d at 408-09 (vacating summary judgment on employee's claim against a corporation); *Grover v. Minette-Mills, Inc.*, 638 A.2d 712, 716-17 (Me. 1994) (affirming jury verdict for employee against a corporation and its employees), a tortious interference cause of action may also be brought by wronged employer.[3]

### 1. Valid Contract or Prospective Economic Advantage

To establish its tortious interference claim, CE must first show CE interfered with a valid contract or prospective economic advantage. CE contends that, despite the absence of written contracts, its employees "had a contractual right to be paid for their labor and a contractual duty to work for their employer with absolute loyalty as long as they were employed." *Pl.'s Mem. of Law in Opp'n to Def.'s First Mot. for Summ. J.* at 16 (Docket # 50) (citing *Universal Electric Corp. v. Golden Shield Corp.*, 316 F.2d 568, 573 (1st Cir. 1963)).

In *Universal Electric*, the First Circuit addressed a situation where key employees of a company, having procured useful inside information about its customer base, resigned and established a company to directly compete with their former employer. *Id.* at 569-71. Applying New York state law, the First Circuit's opinion mostly discussed whether the former employees

---

[3] At oral argument, counsel for CCI conceded that he could not cite determinative Maine authority as to whether a wronged employer can bring a tortious interference claim. *Tr.* 48:18-23 (Docket # 79).

had violated a contractual covenant not to compete. *Id.* at 571-73. The *Universal Electric* Court also referred to an employee's duty of loyalty to an employer, and observed that "[a]t common law the employee owes a duty of loyalty to his employer." *Id.* at 573. Nevertheless, CE offers no authority to suggest that Maine law squarely recognizes a duty of loyalty akin to *Universal Electric*. For its part, CCI argues that the Maine Law Court "has only decided cases involving [an] employee's breach of the duty of loyalty involving directors of a corporation or partners in a partnership." *Def.'s Resp.* at 10 (citing *Rosenthal v. Rosenthal*, 543 A.2d 348 (Me. 1988)).

To resolve this motion for summary judgment, the Court need not mete the boundaries of Maine's duty of loyalty. Under Maine law, a tortious interference claim requires *either* a valid contract *or* prospective economic advantage. *Currie*, 2007 ME 12, ¶ 31, 915 A.2d at 408. An existing employment relationship fits squarely within the latter category. *See MacKerron v. Madura*, 445 A.2d 680, 683 (Me. 1982) ("This Court has long recognized interference with an *existing employment or contract relationship* as an actionable tort." (emphasis added)); *Barnes v. Zappia*, 658 A.2d 1086, 1090 (Me. 1995) (substituting the "existing employment" language of *MacKerron* for the more general "prospective economic advantage").

### 2. Interference through Fraud or Intimidation

Most of the allegedly fraudulent and intimidating statements identified by CE were made by Duncan Morrison, CE's general manager during November and December 2006. Accordingly, the Magistrate Judge identified "the nub" of CE's tortious interference claim as whether Mr. Morrison's statements "can fairly be attributed to CCI." *Rec. Dec.* at 13.

To hold CCI accountable for Mr. Morrison's conduct, CE must adduce sufficient evidence to allow a finder of fact to determine that during the relevant period, there was an employment or agency relationship between Mr. Morrison and CCI. Under Maine law, the "vital

factor in determining [an employee-employer] relationship is 'whether or not the employer has the power of control or superintendence over the other person.'" *Forum Fin. Group v. President & Fellows of Harvard Coll.*, 173 F. Supp. 2d 72, 88 n.22 (D. Me. 2001) (quoting *Legassie v. Bangor Publ'g Co.*, 1999 ME 180, ¶ 6, 741 A.2d 442, 444). "Maine agency law similarly focuses on control: 'Agency is the fiduciary relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.'" *Id.* (quoting *Perry v. H.O. Perry & Son Co.*, 1998 ME 131, ¶ 7, 711 A.2d 1303, 1305); *Camden Nat'l Bank v. Crest Constr., Inc.*, 2008 ME 113, ¶ 19, 952 A.2d 213, 218. "It is the element of continuous subjection to the will of the principal which distinguishes the agent from other fiduciaries. Consent and control are required elements." *J & E Air, Inc. v. State Tax Assessor*, 2001 ME 95, ¶ 14, 773 A.2d 452, 456 (citation and quotation omitted).

The Court previously identified the types of agency-principal relationships recognized in Maine:

> An agency-principal relationship may be either: 1) actual (which may be expressed or implied); or 2) apparent. [*Libby v. Concord Gen. Mut. Ins. Co.*, 452 A.2d 979, 981 (Me. 1982)]. An express actual agency is 'that authority which is directly granted to or conferred upon the agent . . . in express terms by the principal. . . .' *Id.* (quoting *Stevens v. Frost*, 140 Me. 1, [7,] 32 A.2d 164, 168 ([1943])). An implied actual agency is an 'authority circumstantially proven from the facts and circumstances attending the transaction in question.' *Libby*, 452 A.2d at 982 (quoting *Stevens*, [140 Me. at 10,] 32 A.2d at 168). An implied agency may be inferred from 'the words used, from customs and from the relations of the parties.' *Libby*, 452 A.2d at 982 (citing Restatement (Second) [of] Agency, § 7, comment c (1958)).
> Finally, apparent agency involves that authority which 'though not actually granted, the principal knowingly permits the agent to exercise or which he holds himself out as possessing.' *Libby*, 452 A.2d at 982 (citing *Stevens*, [140 Me. at 7,] 32 A.2d at 167-68). An apparent agency, unlike an actual agency, is created only when a third party subjectively believes, by the conduct or words of the purported principal, that another party is an agent. *Libby*, 452 A.2d at 982-83

(citing *Brown v. Manchester, Me.*, 384 A.2d 449, 453 n.4 ([Me.] 1978) (citing Restatement (Second) of Agency § 8 (1958))).

*Higgins v. Penobscot County Sheriff's Dep't*, No. 04-157-B-W, 2005 U.S. Dist. LEXIS 17100, at *5-6 (D. Me. Aug. 15, 2005).

The Magistrate Judge concluded that "the record does not contain any evidence that [CCI's President Keith] Burke or anyone else at CCI had any control over Morrison or made any attempt to direct him or supervise him in connection with his efforts to gauge the interest of the other employees in going to work for CCI." *Rec. Dec.* at 14. CE refutes this finding, asserting that "there is ample evidence of Morrison being directed by CCI with accomplishing CCI's goals, and doing so." *Pl.'s Obj.* at 3-4. CE points to evidence that Mr. Burke had a plan to "lift out" CE employees, that Mr. Burke asked Mr. Morrison to find out if other CE employees were interested in working for CCI, and that Mr. Morrison told other CE employees that he had a job offer from CE that he was going to accept and that CCI was interested in everyone at CE. *Id.* at 5-6.

The direct evidence of communication between CCI and Mr. Morrison about CCI's desire to hire CE employees is limited. In one section of his deposition, Mr. Morrison offers that he volunteered to help CCI determine the interest of his fellow CE employees in positions with CCI:

> Q. Did you have any discussions with anyone at CCI about
> the rest of the employees at Combined Energies?
> A. Yes
> . . .
> Q. And what did you say to [Mr. Burke], and what did he say to you
> about the rest of the Combined Energy employees?
> A. He asked me what [I] felt the interest would be with the
> Combined Energies employees.
> Q. And what did you tell him?
> A. I said I don't know. They probably would be
> interested, and that I would gauge their interest.

7

> Q. And did you do that?
> A. I did.

*Def.'s Statement of Material Facts in Support of its Mot. for Summ. J. on Counts I, IV, V, and VI* (Docket # 40) (*Def.'s First SMF*) at Attach. 6 at 74:10-25 (Docket # 40-7). Later during the same deposition, Mr. Morrison states that he acted at CCI's request:

> Q. Other than that one part-time employee, CCI succeeded in hiring all of Combined Energies' employees, correct?
> A. Correct
> Q. And you assisted CCI in that effort; did you not?
> A. I -- no.
> Q. Did you not gauge their interest on behalf of CCI?
> A. I gauged their interest. I didn't assist in hiring.
> Q. But you went and talked to the people on behalf of CCI to find out if they were interested in going over to CCI; isn't that right?
> A. I shared information that I thought was relevant to the unit.
> Q. And CCI asked you to do that; isn't that correct?
> A. That's correct.
> Q. And you did it because CCI asked you to; isn't that right?
> A. That's correct.

*Id.* at 85:10-25, 86:1.[4]

The balance of CE's agency evidence is circumstantial, but cumulative. It includes: (1) that while Mr. Morrison communicated to his superiors that CE's business prospects for 2007 were promising, his actual opinion and one that he communicated to Mr. Burke was that CE was in trouble; (2) that one of the primary reasons CE employee Candida Hill left CE for CCI was because Mr. Morrison told her that CE lacked internal corporate support for its business

---

[4] Prior to filing the motions for summary judgment, Mr. Morrison submitted an Errata Sheet to his deposition transcript on July 11, 2008. *See Def.'s First SMF* at Attach. 8 (Docket # 40-9). In the Errata Sheet, Mr. Morrison revised his testimony in this latter exchange to be more consistent with the former. Mr. Morrison explained the changes by stating that he "misunderstood [the] question[s]." *Id.* Rule 30(e) allows deponents to provide revised answers to deposition questions. *See* Fed. R. Civ. P. 30(e); *LaMarche v. Metro. Life Ins. Co.*, 236 F. Supp. 2d 34, 40-41 (D. Me. 2002). However, "when a party amends his testimony under Rule 30(e), the original answer to the deposition questions will remain part of the record and can be read at the trial." *Elwell v. Conair, Inc.*, 145 F. Supp. 2d 79, 86 (D. Me. 2001) (quotation and citation omitted). The Court has considered Mr. Morrison's original and revised answers in ruling on Defendant's motions.

initiatives; (3) that at some point after 2003 or 2004, Mr. Morrison shared with other CE employees that CE was up for sale; (4) that some of the CE employees cited CE's possible sale as a reason for resigning from CE; (5) that, in fact, CE was not for sale in 2006; (6) that Mr. Morrison told CE employee Dwayne Robinson in November 2006 that Mr. Robinson might be receiving an employment offer from CCI and that CCI would provide more opportunities to him than CE because CE's work would be diminishing; and, (7) that Mr. Morrison (along with CCI employee Ralph Dean) told Ms. Hill that CCI was committed to opening an East Coast office, a reason later cited by Ms. Hill as an explanation for her resignation from CE, and that the Navy could not continue to pay the overheads of both CE and CCI. *Pl.'s Obj.* at 6-7. CE argues that all of this was inconsistent with Mr. Morrison's duties as an employee of CE, notes that Mr. Morrison kept several of his conversations with other CE employees secret from his superiors at CE, and concludes that these facts support "at least an inference, and in fact much more, that Morrison was recruiting and soliciting employees for CCI." *Id.* at 7.

Next, CE contends that CCI's grant to Mr. Morrison of a $50,000 signing bonus and a $25,000 salary increase over his CE salary of $125,000 "supports an inference that CCI was paying Morrison for more than simply his employment." *Id.* at 7-8. CE argues that "[t]his inference is even stronger in the case at bar since Morrison should not have needed any bonus to induce him to jump ship if he believed his current employer was sinking." *Id.* at 8.

CE argues that CCI had a motive to enlist Mr. Morrison's assistance, noting that CCI twice offered to buy CE in 2006, but was twice rebuffed. *See Pl.'s Opposing Statement of Material Facts* ¶ 56 (Docket # 51) (*Pl's First SMF*); *Def.'s First SMF* ¶ 56. CE argues that the defection of nearly the entire CE workforce to CCI at the same time, January 2007, shows that the move was coordinated, and contends that the circumstances surrounding the transition

support inferences that CCI was the coordinator and that Mr. Morrison was actively involved in the scheme.  CCI's counsel discussed with Mr. Burke the need to time the start dates of the CE employees in such a way as to allow CE to deliver on its existing requirements, this discussion was communicated to Mr. Morrison, and, subsequently, CCI modified its original plan to start the employees on a single date and instead opted for a staggered start.  *Pl.'s Obj.* at 9-10.[5]

The Magistrate Judge concluded that CE's allegations fail to allow a reasonable inference of an agency relationship between CCI and Mr. Morrison.  The question is close.  To be certain, CE has adduced little direct evidence of control possessed or exercised by CCI over Mr. Morrison in 2006.  Direct evidence, however, is not a prerequisite.  *See Chadwick v. WellPoint, Inc.*, 561 F.3d 38, 46 n.9 (1st Cir. 2009) (noting that "circumstantial evidence is not necessarily less probative than direct evidence").  Based on the cumulative record, a juror might reasonably infer that CCI had a plan to hire CE's employees; that Mr. Burke enlisted Mr. Morrison to assist in this plan; that Mr. Morrison consented to act on behalf of CCI while he was still employed at CE; that he delivered on his commitment; and, that he was compensated for his assistance.

CE must also present evidence of fraud or intimidation, and in this effort it is assisted by the Maine Law Court's broad definition of the latter.  Under *Currie*, intimidation

> 'is not restricted to frightening a person for coercive purposes,' but rather exists wherever a defendant has procured a breach of contract by 'making it clear' to the party with which the plaintiff had contracted that the only manner in which that party could avail itself of a particular benefit of working with defendant would be to breach its contract with plaintiff.

2007 ME 12, ¶ 31, 915 A.2d at 408 (quoting *Pombriant*, 562 A.2d at 659).  Here, it can be inferred that CCI persuaded a substantial portion of the CE workforce to leave the CE's employ

---

[5] In a footnote, CE further contends that the record "is replete with examples of Morrison taking actions in 2006 at the sole request of, and for the sole benefit of, CCI." *Pl.'s Obj.* at 4 n.2.  A careful review of the record reveals that the Magistrate Judge's characterization of the evidence is accurate:  "Morrison, while employed by Combined Energies, also assisted Mr. Burke with efforts to pursue additional work unrelated to the Navy JOC and outside of the northeast that CCI would not necessarily have shared with Combined Energies." *Rec. Dec.* at 11.

by making it clear to the CE employees that the only manner in which they could remain employed and continue to benefit from CCI's preferential access to government contracts would be to leave CE and join CCI. Taken together, the Court disagrees with the Magistrate Judge that CE's evidence fails to raise a genuine issue of material fact on this question.

### 3. Proximate Damages

In its Complaint, CE alleges that "[a]s a proximate result of CCI's actions, CE has been damaged in its ability to perform under its current contracts and to obtain new contracts, in its loss of current and prospective income, and in damage to business reputation in an amount to be proven at trial in excess of $75,000. *Compl.* ¶ 31; *see also Pl.'s First SMF* ¶¶ 30-33, 72-74; *CCI, Inc.'s Reply Statement of Material Facts* ¶¶ 30-33, 72-74 (Docket # 57). CCI does not contest the proximate damages element; a trial-worthy issue exists.

### B.     Unjust Enrichment (Count Two)

The Magistrate Judge concluded that CE could not sustain a claim for unjust enrichment because the former CE employees joined CCI in pursuit of their self interest and not at the behest of CE and, therefore, "the benefit that CCI realized in recruiting these employees was not one conferred by or on behalf of Combined Energies." *Rec. Dec.* at 20-21. CE objects that its willingness to confer the benefit of its employees to CCI is immaterial, arguing that it is enough that CCI retained the benefit of their services, along with the benefit of CE's contracts, customers, and goodwill, through tortious conduct. CCI counters that such circumstances might give rise to a claim for conversion, but not unjust enrichment.

CE has not offered and the Court has not identified a case explicitly addressing whether, for the purposes of an unjust enrichment claim under Maine law, the conferred benefit must be voluntarily transferred, or whether it could also be tortiously acquired. A federal court in this

11

district concluded that a tortious transfer is not adequate. *See McBee v. Delica Co.*, No. 02-198-P-C, 2004 U.S. Dist. LEXIS 23415, at *48 (D. Me. Aug. 19, 2004) ("I agree that this tort requires some action by the plaintiff that confers a benefit on the defendant. The defendant's appropriation of property of the plaintiff for purposes of financial gain does not fit within the definition of the tort.") *aff'd in relevant part*, No. 02-198-P-C, 2004 U.S. Dist. LEXIS 23414 (D. Me. Nov. 19, 2004), *aff'd*, 417 F.3d 107 (1st Cir. 2005). This interpretation is consistent with the language used by the Maine Law Court to set forth the first element of the tort: "A claim for unjust enrichment requires the complaining party to show that: (1) it conferred a benefit on the other party . . . ." *Platz Assocs. v. Finley*, 2009 ME 55, ¶ 27, __ A.2d __ (internal quotation omitted); *see Webster's Third New Int'l Dict.* 475 (2002) (defining "confer" as "to grant or bestow").

Despite the "confer" language, the Maine Law Court recently signaled that the benefit need not be voluntarily transferred. *Me. Eye Care Assocs. P.A. v. Gorman*, 2008 ME 36, ¶¶ 17-18, 942 A.2d 707, 712-13 ("[T]he court cannot find that a defendant was unjustly enriched without first finding that something of value *has been taken* or retained without adequate compensation." (emphasis added)). In light of this language, the Court concludes that Maine law does not require a voluntarily conferred benefit.[6]

---

[6] The Restatement of Restitution is equivocal. It states the principle that "[a] person is not permitted to profit by his own wrong at the expense of another." Restatement of Restitution § 3 (1937). However, "[t]he principle has not yet crystallized into a rule." *id.* § 3 cmt. a. The Restatement explains:
> The desirability of permitting restitution in such cases is ordinarily not so obvious as in the cases where there has been no tort since the tortfeasor is always subject to liability in an action for damages and . . . the right to maintain an action for restitution in such cases is largely the product of imperfections in the tort remedies, some of which imperfections have now been removed.

*Id.*; *see also id.* at ch. 7 introductory note ("Actions of tort are ordinarily not restitutionary . . . . They are based primarily upon wrongdoing and ordinarily, through the payment of money, compensate the injured person for the harm suffered by him as a result of the wrongful conduct, irrespective of the receipt of anything by the defendant."). Chapter seven of the Restatement identifies specific situations where restitution is appropriate to compensate for a tortiously acquired benefit, but none of the situations closely resembles the facts here. *See id.* §§ 128-138.

CCI contends that CE's "generic" unjust enrichment claim "cannot be permitted to enlarge the contract and tort claims already asserted in the Complaint." *Def.'s Resp.* at 19. As the Magistrate Judge noted, however, where a dispute concerns extra-contractual matters, an unjust enrichment claim may lie. *Rec. Dec.* at 21 (citing *Ingram v. Rencor Controls Inc.*, 256 F. Supp. 2d 12, 22-23 (D. Me. 2003)); *see also Fed. Ins. Co. v. Me. Yankee Atomic Power Co.*, 183 F. Supp. 2d 76, 83-86 (D. Me. 2001). CE and CCI had a contractual relationship, but it did not cover the transfer to CCI from CE of its employees, contracts, customers, or goodwill. Further, the Court is unaware of any authority for the proposition that an unjust enrichment claim cannot be brought contemporaneously with tort claims. *See, e.g.*, *Me. Eye Care Assocs. P.A. v. Gorman*, 2006 ME 15, ¶ 9, 890 A.2d 707, 709 (involving, *inter alia*, unjust enrichment and tort claims).[7]

### C. Breach of Contract (Count Three)

After noting that "the Court need not rule on the question of contract scope at this juncture," the Magistrate Judge recommended that the Court "grant CCI's request and restrict the scope of the breach of contract claim so that it corresponds with contract N62472-05-R-7510 and not any other 8(a) government contract work that the parties might have, but did not, successfully bid on as a team."[8] *Rec. Dec.* at 19-20. The Court declines the Magistrate Judge's invitation and leaves the scope of the various contracts for the jury to determine.

Whether a contract is ambiguous is a question of law to be determined by the Court. *Lee v. Scotia Prince Cruises, Ltd.*, 2003 ME 78, ¶ 9, 828 A.2d 210, 213; *Nadherny v. Roseland Prop. Co.*, 390 F.3d 44, 48-49 (1st Cir. 2004). If ambiguous, the interpretation of the contract is

---

[7] CE's unjust enrichment claim is "an equitable action and, thus, one not triable of right by jury." *Bowden v. Grindle*, 651 A.2d 347, 351 (Me. 1994).

[8] The federal 8(a) Business Development Program provides minority-owned businesses preferential access to government contracts. *Def.'s Statement of Material Facts in Support of its Mot. for Summ. J. on Counts II and III* ¶ 4 (Docket # 47) (*Def.'s Second SMF*); *Pl.'s Second Opposing Statement of Material Facts* ¶ 4 (Docket # 59) (*Pl.'s Second SMF*). As an Alaska-based company owned by Alaska-native shareholders, CCI qualifies for the 8(a) program. *Id.* ¶ 3.

generally a question of fact for the fact-finder. *Id.* A contract's language is ambiguous when it is reasonably susceptible of different interpretations. *Id.*

The Court looks "at the entire instrument when construing [a] contract and attempt[s] to give effect to all of its provisions." *Ackerman v. Yates*, 2004 ME 56, ¶ 10, 847 A.2d 418, 422 (citing *Am. Prot. Ins. Co. v. Acadia Ins. Co.*, 2003 ME 6, ¶ 11, 814 A.2d 989, 993). The Court avoids any interpretation that would render a contract provision meaningless, and interprets contract terms by reference to the plain meaning of the language used. *Ackerman*, 2004 ME 56, ¶ 10; 847 A.2d at 422.

### 1. Teaming Agreement

The basic argument as to the two contracts at the center of this dispute—the Teaming Agreement and the Strategic Alliance Agreement—is the same. CCI argues that the agreements are limited to the parties' joint efforts to secure and perform under a specific Job Order Contract (JOC)[9] with the U.S. Navy. CE argues that the agreements are broader than a single JOC and contemplate joint pursuit of other similar opportunities.

The difficulty with the Teaming Agreement is squaring the main text of the contract with its exhibit. According to its preamble, the contract "states the nature and extent of the agreement between [CE and CCI] to develop and submit a proposal to the U.S. Navy . . . for IDIQ JOC Facilities Support." *Compl.* at Attach. 1 (Docket # 1-2) (*Teaming Agreement*).[10] The proposal was to be submitted in response to "the Subject Solicitation," a term undefined in the contract. *Id.* CCI contends that the Subject Solicitation refers to a particular request for proposal issued by

---

[9] A JOC is an umbrella contract awarded by the federal government, which allows the recipient to subsequently respond to government requests to perform specific projects falling within the scope of the JOC. *See Def.'s Second SMF* ¶ 6; *Pl.'s Second SMF* ¶ 6.

[10] At oral argument, counsel represented that IDIQ is a contracting acronym meaning Indefinite Delivery Indefinite Quantity.

the Navy and identified as solicitation number N62472-05-R-7510. *Rec. Dec.* at 8. CE does not offer an alternative interpretation. *Id.*

In contrast to the preamble, which seems to limit the Teaming Agreement to a single proposal, Exhibit A seems to contemplate that N62472-05-R-7510 is only the initial template for an ongoing business relationship:

> The scope of work for this agreement includes 8(a) related contract opportunities for the U.S. Navy facilities in ME, NH and VT and any additional future 8(a) contract and business development opportunities for the U.S. Navy facilities included in the CNRNE geographic territory (Commander Navy Region Northeast).

*Teaming Agreement* at Ex. A. CE characterizes Exhibit A as an express statement that the purpose of the Teaming Agreement was to find more work for CE and CCI beyond the single JOC contract. *Pl.'s Obj.* at 14. CCI argues that the Teaming Agreement expressly disavows any obligation or agreement beyond the Subject Solicitation. *Def.'s Resp.* at 14-15.

Exhibit A is referenced in the body of the Teaming Agreement three times. The first occurrence is in the recitals:

> WHEREAS, Combined Energies has expertise and capabilities for the [IDIQ JOC Facilities Support] within those areas identified and set forth in Exhibit A, Scope of Work, . . . NOW THEREFORE . . . CCI and Combined Energies do hereby covenant and agree as follows . . .

*Teaming Agreement* at 1. Second, in a provision on "proposal activities":

> The scope of work to be performed by [CE] under [IDIQ JOC Facilities Support] shall be consistent with Exhibit A.

*Id.* ¶ 1.A. Third, in a provision on "award of prime contract and subcontract":

> If a prime contract is awarded to [CCI] as a consequence of the Proposal submitted in response to the Subject Solicitation, the parties shall enter into a master subcontract agreement, consistent with Exhibit A hereto, which shall contain such terms and conditions as are mutually agreeable to the parties. . . .

*Id.* ¶ 8. None of these references clarifies what the parties intended when they attached Exhibit A to the Teaming Agreement.

Perhaps with good cause—the draftsmanship here falls far short of exemplary—neither party has succeeded in proposing an altogether satisfying interpretation of Exhibit A and its relationship to the rest of the Teaming Agreement or the Strategic Alliance Agreement. As CCI hypothesized at oral argument, the exhibit may have been intended merely to describe the types of opportunities CE was capable of completing under the N62472-05-R-7510 contract should it be awarded, and the geographic scope of its capabilities. Nevertheless, given the express language of the agreement referencing "additional future 8(a) contract and business development opportunities," the Court cannot conclude that this interpretation is the only correct one as a matter of law.

### 2. Strategic Alliance Agreement

The Strategic Alliance Agreement, a contract entered into by CE and CCI after the parties successfully teamed together to secure Navy contract N62472-05-R-7510, is similarly opaque. As with the Teaming Agreement, CE contends that the Strategic Alliance Agreement created an expanded contractual relationship between CE and CCI that imposed reciprocal rights and obligations extending beyond a single JOC. CCI argues that it simply outlined the terms of the parties' working relationship under that contract.

At the center of the dispute is a single provision:

> CE and CCI agree to strategically align themselves with one another in order to promote and utilize their respective expertise for the purpose of developing and performing projects utilizing [contract N62472-05-R-7510] (the 'Business').

*Compl.* at Attach. 2 ¶ I.A. (Docket # 1-3) (*Strategic Alliance Agreement*). The parties vigorously debate what it means to strategically align for the purpose of developing and performing projects

"utilizing" Navy contract N62472-05-R-7510. CCI notes that the Navy contract is an umbrella contract, and argues that utilizing it means developing and performing subprojects under it. CE argues that the term means that the parties agreed to use the Navy contract as a model to pursue opportunities beyond the Navy contract.

The remaining terms in the Strategic Alliance Agreement are generally unhelpful. One provision discusses geographic scope:

> The primary geographic area for Business under this Agreement is the Northeastern United States to encompass, Massachusetts, Rhode Island, New Hampshire, Connecticut, Vermont, Maine, New York and New Jersey; and other locations mutually agreed upon from time to time by the parties as may make reasonable business sense for the Business.

*Id.* ¶ I.D. Under CCI's preferred interpretation, this provision might be construed to define the areas where subprojects under the Navy contract are primarily to be located; under CE's version, it might define the target area for future projects.

Again, the Court cannot conclude that either CE or CCI's interpretation is unreasonable as a matter of law. The scope of the Strategic Alliance Agreement, like the Teaming Agreement, is ambiguous and, therefore, is a matter for the jury.

### D. Implied Covenants (Count Four)

In recommending dismissal of CE's claim for breach of implied covenants, the Magistrate Judge observed that the Maine Law Court "has only recognized an [implied covenant of good faith and fair dealing] where it has been provided for by statute or amounts to a breach of a fiduciary relationship." *Rec. Dec.* at 15. CE concedes that no statute provides for an implied covenant here, *see Tr.* 4:10-17, but contends that the existence of a fiduciary relationship or something like it between CCI and CE is a question of fact for the jury. *See Pl.'s Obj.* at 18-19. CE cites entry of the parties into the Teaming Agreement and Strategic Alliance Agreement;

an agenda from a meeting between the parties entitled "Partnering Agenda" and including the statement that "the members of the virtual organization must behave toward each other in a trusting and trustworthy manner"; deposition testimony from Mr. Burke that trust between the parties was a "key factor" in the success of their joint effort and his admission that CCI's hiring CE's employees would create challenges for CE; and, the evidence underlying its tortious interference claim. *Id.* Finally, CE renews its contention made before the Magistrate Judge that CCI's conduct gives rise to its claim under *Top of the Track Associates v. Lewiston Raceways, Inc.*, 654 A.2d 1293 (Me. 1995).

There are two "salient elements" of a fiduciary relationship:  "(1) the actual placing of trust and confidence in fact by one party in another, and (2) a great disparity of position and influence between the parties at issue." *Bryan R. v. Watchtower Bible & Tract Soc'y, Inc.*, 1999 ME 144, ¶ 19, 738 A.2d 839, 846 (citation and quotation omitted).  Fiduciary relationships may exist in several situations, including between business partners, families engaged in financial transactions, and among shareholders in a close corporation. *See id.* "Simple recitations of a trusting relationship will not suffice for identifying a fiduciary duty." *Id.* ¶ 20-21, 738 A.2d at 846 ("A fiduciary duty will be found to exist, as a matter of law, only in circumstances where the law will recognize both the disparate positions of the parties and a reasonable basis for the placement of trust and confidence in the superior party.").  A court will generally not find a fiduciary relationship between two corporations whose relationship is governed by a contract negotiated at arm's length. *New Eng. Surfaces v. E.I. Du Pont de Nemours & Co.*, 517 F. Supp. 2d 466, 489-90 (D. Me. 2007), *rev'd in part on other grounds*, 546 F.3d 1 (1st Cir. 2008) (collecting cases).

Here, the Teaming Agreement and the Strategic Alliance Agreement expressly disclaim any agency relationship between CE and CCI, s*ee Teaming Agreement* ¶ 3 ("Neither party is the agent of the other and neither may bind the other."); *Strategic Alliance Agreement* ¶ II.C. ("This agreement in no way creates a legal partnership or any other form of common ownership or control.  Each party is a separate and independent corporate entity, to be treated with independent contractor status."), and CE's evidence does not support an inference that the agreements were anything other than the result of arm's-length negotiation.  Further, based on this record, there is no reasonable basis for a factfinder to infer "a great disparity of position and influence between the parties."  *See Bryan R.*, 1999 ME 144, ¶ 19, 738 A.2d at 846.

The Court finds no error in the Magistrate Judge's reading of *Top of the Track*.  *See Rec. Dec.* at 16.  That case, involving breach of contract and unjust enrichment claims, neither extended the range of circumstances where an obligation of good faith and fair dealing adheres, nor explicitly adopted a standalone cause of action in Maine for breach of "an implied covenant in contracts that neither party shall by its unilateral action destroy or injure the right of the other party to receive the fruits or benefits of the contract or render performance impossible."  *See Top of the Track Assoc.*, 654 A.2d at 1294-96.  As to the latter point, CE has not identified and the Court has not found any case interpreting *Top of the Track* to establish such a cause of action independent of a breach of contract claim, and the joint judgments of the Maine Law Court and the Maine legislature on issues of Maine law must control.  *See Caldwell v. Federal Express Corp.*, 908 F. Supp. 29, 36 (D. Me. 1995).  Summary judgment on Count Four is affirmed.

### E.     Punitive Damages (Count Six)

Based on her recommendation to dismiss CE's tort claims, the Magistrate Judge urged dismissal of CE's punitive damages claim.  *Rec. Dec.* at 16.  As the Court rejects the Magistrate

Judge's recommendation as to CE's tortious interference claim, and CCI has presented no alternative rationale why punitive damages are otherwise unavailable, CCI's motion to dismiss CE's punitive damages claim is denied.

## III. CONCLUSION

The Court therefore ORDERS that the Recommended Decision of the Magistrate Judge (Docket # 68) is hereby AFFIRMED IN PART and REJECTED IN PART. The Court further ORDERS that Defendant's Motion for Summary Judgment on Counts I, IV, V, and VI (Docket # 39) is GRANTED as to Plaintiff's implied covenants claim (Count Four) and DENIED on Plaintiff's other claims. Defendant's Motion for Summary Judgment on Counts II and III (Docket # 46) is DENIED.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 18th day of June, 2009